**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

KELLIE WALKER,                               :
                                            :        Civil Action No.:
                            Plaintiff,       :
                                            :
            v.                               :        **COMPLAINT**
                                            :
TRIBOROUGH BRIDGE AND TUNNEL                 :
AUTHORITY, d/b/a METROPOLITAN                :        **Jury Trial Demanded**
TRANSPORTATION AUTHORITY BRIDGES             :
AND TUNNELS, VICTOR MUALLEM, and             :
SHARON GALLO-KOTCHER, in their               :
individual and professional capacities.      :
                                            :
                            Defendants.       :
-------------------------------------------------------------X

Plaintiff  Kellie Walker ("Plaintiff" or "Ms. Walker"), by and through her attorneys,
Wigdor LLP, as and for her Complaint against Defendants Triborough Bridge and Tunnel
Authority, d/b/a Metropolitan Transportation Authority Bridges and Tunnels ("TBTA"), an
affiliate agency of the Metropolitan Transportation Authority (together, the "MTA"), Victor
Muallem ("Muallem"), in his individual and professional capacities, and Sharon Gallo-Kotcher
("Gallo-Kotcher") in her individual and professional capacities, (collectively the "Defendants"),
hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Kellie Walker, a 50-year-old Black woman, single mother and attorney has been a
dedicated civil servant for over twelve years.

2.      Unfortunately, at the MTA, Ms. Walker has experienced and continues to be
subjected to a violent and hostile work environment.

3.      As detailed below, at all relevant times, Victor Muallem, a 60-year-old white
male that supervises Ms. Walker, regularly subjected Ms. Walker to aggressive and abusive

behavior.  For example, one day in November 2019, Muallem stormed into Ms. Walker's office and screamed at her with the door open so that the entire office could hear.

4.      On January 8, 2020, Muallem openly berated Ms. Walker in front of colleagues and clients.  During this incident, Muallem was so enraged that spit flew out of his mouth.

5.      Horrifically, on February 3, 2020, during an arbitration hearing in New York City, Muallem became so mad at Ms. Walker that he hurled back his arm and physically hit Ms. Walker.  Unbelievably, Ms. Walker was in the middle of cross-examining a witness when Muallem hit her.  Multiple people at the hearing saw the assault and battery including witnesses, other attorneys and the arbitrator.  Stunned, shocked, humiliated and in pain, Ms. Walker ran out of the hearing as soon as she was finished.

6.      The aftermath of the trauma caused Ms. Walker to take medical leave.  Since then, Ms. Walker frequently suffers from periods of incessant crying, nightmares, heart palpitations, panic attacks, stress and anxiety.  Because of the assault and battery by Muallem, Ms. Walker now is under regular psychiatric care.

7.      Worse, although Ms. Walker reported the incident to the police, the TBTA and to the MTA, Defendants have done nothing.  Almost a year later, Muallem continues to work at the MTA in a supervisory attorney position and Ms. Walker is expected to work as if nothing ever happened.  She lives in fear of working in the same courtroom as Muallem.

8.      Such total marginalization and utter lack of accountability by the TBTA and MTA has increased Ms. Walker's suffering and harm.

9.      For years, because of Muallem's prior behavior, Gallo-Kotcher, the TBTA and the MTA knew and were aware of his propensity to publicly demean, marginalize and threaten female employees, including those under his supervision.  But Defendants opted to do nothing.

Not surprisingly, Muallem, emboldened by a lack of discipline for his unlawful behavior, intensified his vitriol.

10.     Defendants could have prevented the assault and battery experienced by Ms. Walker.   Instead, they opted to double-down, allowing Muallem to carry on unabated, while inflicting constant retaliation on Ms. Walker, exacerbating the emotional stress she suffers from as a result of the assault, battery and other abuses she suffered and continues to suffer at the hands of her supervisors.

11.     Even in the aftermath of the racist murders of George Floyd and Breonna Taylor, and the racist shooting of Jacob Blake and the ensuing global outrage and protests over excessive violence inflicted on Black citizens, Defendants failed to pause and examine what happened on February 3, 2020.   On that day – in the middle of a hearing with seven people present, a supervisory white male, with a history of uncontrolled temper, inflicted senseless violence on Ms. Walker, a junior Black female, as she was in the process of cross-examining a witness.

12.     The TBTA and the MTA – fueled with the hard-earned money of New York State taxpayers failed to take this moment, a second opportunity, to reflect on the assault and battery and to do the right thing.   Unfortunately, time and time again, the TBTA and the MTA have utterly failed their minority employees.

13.     Most troubling, as set forth below, the TBTA and the MTA have, in true hypocritical fashion, actively sought to *silence* Ms. Walker because she dared speak up about the workplace violence at the hands of her white male superior.

14.     No female employee should fear speaking up about being physically hit by her boss.

15.     Defendants must be held accountable for this atrocious, unacceptable and unlawful conduct.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions under 42 U.S.C. §§ 1981 and 1983.   The Court has supplemental jurisdiction over Plaintiff's claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

18.     Plaintiff Kellie Walker is an employee of the MTA.   Ms. Walker was at all relevant times an "employee" of Defendant MTA under all relevant statutes.   Ms. Walker is a resident of the State of New York.

19.     Defendant MTA is a domestic government entity that is headquartered at 2 Broadway, New York, New York 10004.   At all relevant times, Defendant MTA met the definition of "employer" under all applicable statutes.

20.     Defendant Victor Muallem is a Director of Labor Relations of the MTA.   Mr. Muallem had the authority to direct Plaintiff's work activities, assign her job responsibilities and monitor her performance.   Accordingly, at all relevant times, Muallem was a "supervisor" within the meaning of all applicable statutes.   Upon information and belief, Muallem is a resident of the State of New York.

21.     Defendant Sharon Gallo-Kotcher is the Vice President of Labor Relations of the MTA.  Ms. Gallo-Kotcher had the authority to direct Plaintiff's work activities, assign her job responsibilities and monitor her performance.   Accordingly, at all relevant times, Ms. Gallo-Kotcher was a "supervisor" within the meaning of all applicable statutes.  Upon information and belief, Ms. Gallo-Kotcher is a resident of the State of New York.

## ADMINISTRATIVE REQUIREMENTS

22.     Prior to the filing of this complaint, Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").   Upon issuance of a Notice of Right to Sue or other adjudication of the Charge, Plaintiff shall amend her Complaint to assert claims under Title VII.

23.     Pursuant to New York City Human Rights Law ("NYCHRL") § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

24.     Plaintiff timely served a notice of claim on the City of New York within 90 days after her tort claims arose.  More than 30 days have elapsed since the notice of claim was filed, and the municipal employee Defendants have failed to satisfy Plaintiff's claim.

25.     Plaintiff has complied with any and all other prerequisites to filing this action.

## FACTUAL ALLEGATIONS

26.     Kellie Walker is a 50-year-old Black woman, single mother and an accomplished attorney.

27.     She completed her undergraduate studies at Boston University ("BU") –
Wheelock College in 1993, graduating *magna cum laude*.  She received her Masters of Social
Work from BU in 1994 and graduated from Boston College Law School in 1998.

28.     After Ms. Walker graduated law school, she served as an associate at several law
firms from 2000 until 2008, specializing in labor and employment.

29.     Ms. Walker, however, felt a draw to public service and decided to dedicate herself
to government work.  From 2008 to 2018, she served in the New York City Department of
Education's Office of Labor Relations and Collective Bargaining.

30.     Since September 2018 through the present, Ms. Walker has worked for the
MTA's Office of Labor Relations, representing clients in complex matters arising under
collective bargaining, including arbitration.

31.     Three attorneys at the MTA report directly to Muallem: Ms. Walker, Alexandria
Jean-Pierre and Eduardo Miyashiro.  Ms. Jean-Pierre, like Ms. Walker, is a Black woman and is
approximately 40 years old.  Mr. Miyashiro, a man in his late 40s, is not Black.

32.     Muallem is a white male and about 60 years old.  He has worked at the MTA
since approximately 2014.  Prior to working at the MTA, Muallem worked at the New York City
Department of Education.

33.     Ms. Gallo-Kotcher is a white female and is about 61 years old.

34.     In or about the Spring of 2019, the tenor of Ms. Walker's working relationship
with Muallem began to change dramatically – Muallem began to direct severe animosity towards
Ms. Walker and Ms. Jean-Pierre.  Muallem would not direct this animosity towards Mr.
Miyashiro.

35. Rather, Mr. Miyashiro was viewed by his colleagues as the right-hand man of Ms. Gallo-Kotcher, who clearly showed Mr. Miyashiro favor. As a result, Mr. Miyashiro, though hired at a level equal to that of Ms. Walker and Ms. Jean-Pierre, is viewed as their superior. It soon became clear to Ms. Walker that Mr. Miyashiro was being groomed for a supervisory position.

36. Mr. Miyashiro's status at TBTA became quickly elevated and he surpassed Ms. Walker and Ms. Jean-Pierre quickly. For example, Mr. Miyashiro was allowed to go to higher level meetings where Ms. Walker and Ms. Jeanne-Pierre would be excluded.

37. This favoritism showed towards the one employee who was not a Black single mother helped him escape the wrath of Muallem.

38. In April 2019, Muallem began to email Ms. Walker unwarranted and gratuitous criticisms about Ms. Walker's work product, copying Ms. Gallo-Kotcher. These highly critical emails continued with frequency through at least December 2019. Furthermore, during in-office interactions with Ms. Walker, Muallem would make belittling comments to Ms. Walker and would often roll his eyes at her.

39. That summer, in or around July 2019, Ms. Walker requested a few days off. Muallem initially denied her request, explaining that Ms. Walker needed to prepare for arbitration hearings scheduled *three months later*, in October. Muallem only relented and approved Ms. Walker's request for time off after Mr. Miyashiro intervened and explained to Muallem that there was indeed enough time for Ms. Walker to take time off and still prepare for the hearings.

40. On another occasion, on or around November 2019, Muallem opened the door to Ms. Walker's office, stormed in and engaged the doorstop so that it remained open. Then, so the

entire office could hear him, he screamed at Ms. Walker at the top of his lungs, criticizing her work.  Ms. Walker summoned the wherewithal to ask Muallem to please close the door, so that she would not have to be humiliated in front of all of her colleagues.

41.     The animosity that Muallem directed toward Ms. Walker weighed heavily on her and made it increasingly difficult for her to do her job.

42.     Muallem's behavior only escalated.  On January 8, 2020, during an arbitration hearing, Muallem verbally abused Ms. Walker.  Before the arbitration was set to begin, Muallem asked Ms. Walker whether she could give the opening statement.  Ms. Walker agreed to do so. When she explained what she would cover in the opening statement, Muallem interjected and shouted at her, insisting that she instead focus on other points.

43.     As Ms. Walker started to give her opening statement, Muallem interrupted her repeatedly and insisted – audibly so that everyone else at the proceeding could hear him – that she incorporate details from a prior case that Muallem, but not Ms. Walker, had worked on.

44.     Muallem's temper escalated, and he further yelled, berated and belittled Ms. Walker in front of the MTA's clients, Mark Klosner and Erik Horman; consultant James Fortunato; the TBTA's Superior Officers Benevolent Association ("SOBA") Board; opposing counsel, Christopher Rothemich; and Arbitrator John Sands.

45.     Muallem's aggressive behavior and yelling at Ms. Walker was meant to imply that he believed she was incompetent.  It also shows that as a white male, he believed it was acceptable for him to subject a junior Black female employee to such horrific discrimination and humiliation.

46.     His yelling became so intense and aggressive that spit was flying out of his mouth.

47.     At all relevant times, Ms. Walker never witnessed Muallem treat a junior white employee in such an unlawful, discriminatory manner.

48.     Still in the middle of Ms. Walker's opening statement, because Muallem would not stop interrupting, Arbitrator Sands called Ms. Walker and Muallem, as well as Mr. Rothemich, out of the room to discuss Muallem's behavior.  Arbitrator Sands told Muallem, in the presence of Mr. Rothemich, that Ms. Walker was "doing a wonderful job" and that Muallem's incessant interruptions were preventing Ms. Walker from performing at the absolute best of her abilities.

49.     Following the hearing, Mr. Klosner told Ms. Walker that he was "sorry [Ms. Walker] had to go through that."  Mr. Rothemich also subsequently spoke with Ms. Walker and told her that he "didn't know what all that was about" and that the incident was "something else."

50.     Ms. Walker – though thankful that Arbitrator Sands had supported her – knew that it was only a matter of time before Muallem, who was embarrassed by Arbitrator Sands' intervention, would escalate his actions against her.

51.     Ms. Walker's fears were confirmed.  Less than a month later, on February 3, 2020, Ms. Walker was physically hit by Muallem during an arbitration hearing at the American Arbitration Association.

52.     Specifically, during Ms. Walker's cross-examination of a witness, Christina Lampropoulos, Muallem, who was sitting next to Ms. Walker, became irate and struck Ms. Walker's left arm with the back of his hand.

53.     The assault and battery, during a hearing in front of opposing counsel and witnesses, left Ms. Walker in physical and emotional shock, embarrassed her and left visible bruising.

54.     Specifically, the assault and battery occurred in the presence of multiple witnesses, including members of the SOBA Board, Arbitrator Dan Brent, Christopher Coradin, a Superintendent of the TBTA, Ms. Lampropoulos and the court reporter.

55.     Ms. Walker never witnessed Muallem hit or physically strike a white employee – male or female.

56.     Although she was in pain and humiliated, Ms. Walker tried not to cry, scream in pain or run out of the room.  Ms. Walker sat there even though she wanted to run and hide from Muallem.

57.     After the hearing concluded, Ms. Walker went into a nearby hearing room and hid in a closet.  From there, Ms. Walker called her co-worker, Ms. Jean-Pierre, to tell her what had happened.  Ms. Walker was so distraught that she could not express how she really felt to Ms. Jean-Pierre because she was afraid that she would break down, cry and shortly after have to face her assailant, Muallem, as well as colleagues and opposing attorneys, with tears streaming down her face.

58.     Still in shock and feeling pain in her arm, Ms. Walker found Muallem speaking with opposing counsel Alex Kaminski to schedule hearing dates.  Ms. Walker summoned the courage to participate in the discussion regarding scheduling.

59.     After dates had been scheduled, Ms. Walker could not bear being in Muallem's presence any longer.  She told Muallem that she was ready to leave.

60.     Muallem decided to leave, too.  Ms. Walker was forced to ride the elevator down with Muallem.   After Ms. Walker and Muallem exited the elevator, Ms. Walker informed Muallem that she could walk to her car herself.  Muallem then said that he would take the back way out of the building.

61.     Ms. Walker had been to this office building with Muallem numerous times.  He had never exited the back way before, reflecting Muallem's understanding that he had done something gravely wrong.

62.     Ms. Walker went back to her office building, entered the building, clocked out and drove home.  Ms. Walker was too distraught to go up to her office.  Ms. Walker cried the entire way home.  The only moments when she was able to suppress her anguish was when she was caring for her daughter.

63.     The next day, on February 4th, Ms. Walker submitted a Workplace Violence Incident form to Ms. Gallo-Kotcher regarding Muallem striking her.

64.     The day after that, on February 5th, Ms. Walker filed an Incident Report with the New York City Police Department recounting the events of February 3rd.  At the police station, Ms. Walker showed the bruise on her left arm to the officer who took down her report.  The report stated that Ms. Walker was "seriously alarmed" and that she "fears for her safety."

65.     On February 6th, Ms. Walker obtained a medical note from her physician, advising Ms. Walker to take a temporary leave of absence from work.

66.     Furthermore, as any reasonable woman in her situation would do, Ms. Walker told Ms. Gallo-Kotcher that she could not be in physical proximity to Muallem.  Nevertheless, the day after Muallem struck Ms. Walker, the MTA and Ms. Gallo-Kotcher expected Ms. Walker to show up at work and report to Muallem, business as usual.

11

67.     The MTA and Ms. Gallo-Kotcher further expected Ms. Walker, just days after she was struck by Muallem, to conduct a trial with Muallem.

68.     In fact, Ms. Walker had to proactively inform Ms. Gallo-Kotcher that she could not do this because she was experiencing panic attacks, breaking down sobbing and shaking at the thought of being in a room with Muallem.  Every time Ms. Walker would enter the MTA office building or walk through the building's hallway, her heart would race as she remembered Muallem striking her and considered whether she would run into him.

69.     Toward the end of February, Ms. Walker retained counsel and, through her counsel, sent a letter of representation to the MTA.  At that point, the MTA – with Ms. Gallo-Kotcher leading the charge – began a retaliation campaign against Ms. Walker.

70.     Ms. Gallo-Kotcher began intensely micromanaging Ms. Walker at work.  For instance, Ms. Gallo-Kotcher began to comment on the times Ms. Walker – a longtime employee – would clock in and out of work.  Ms. Gallo-Kotcher had never commented on Ms. Walker's time prior to her report.

71.     Indeed, TBTA and Ms. Gallo-Kotcher purposefully have made Ms. Walker aware of their excessive monitoring of her time.  By way of example only, Ms. Walker received the following from Patrick Smith, a human resources employee ("HR"):

> [Raina Bertram] sent you a routine inquiry regarding the Kronos entries.  Please be advised that any leave taken since February 4, 2020 (i.e., hours less than 8 in any given work day) will be recorded and treated as paid administrative leave until further notice.  The timekeeping unit will update internal records accordingly, so no further action is required on your part concerning your timecard at this time.

72.     On one occasion, on February 27, 2020, this intense micromanagement flustered Ms. Walker at a work meeting.  Ms. Gallo-Kotcher exploited this moment to excessively

reprimand Ms. Walker about a purported "mistake" Ms. Walker had made in September 2019, five months prior.

73.     Further evidencing her retaliatory behavior, on May 28th, Ms. Gallo-Kotcher sent Ms. Walker an email demanding that Ms. Walker create a report updating Ms. Gallo-Kotcher on the status of all of her cases *within the hour*.  This was not standard practice.  Notably, Ms. Gallo-Kotcher did not send a similar message to Ms. Walker's co-worker, who has a caseload similar to Ms. Walker's.  Moreover, the work Ms. Walker completes on a day-to-day basis is on par with this same co-worker.

74.     In November 2020, as COVID-19 cases again began to rise in New York, Ms. Gallo-Kotcher suddenly instructed Ms. Walker to physically go into the office to conduct *virtual* litigation, including conferences.  Ms. Walker suffers from chronic lupus, an underlying condition putting her at greater risk of serious illness or death if she were infected with COVID-19.

75.     Apart from the risk related to the COVID-19 pandemic, forcing Ms. Walker to go into the office creates the risk that Ms. Walker will have to cross paths with Muallem.  Ms. Gallo-Kotcher's purported rationale was "ease of collaboration," explaining that exchanging emails during these proceedings "just doesn't work."  But Ms. Gallo-Kotcher's reasoning is unsound: Ms. Gallo-Kotcher initially permitted Ms. Walker to virtually conduct conferences from home and so it is unclear what would be accomplished by Ms. Walker physically going to the office to *virtually* conduct proceedings held *via videoconference*.  Ms. Gallo-Kotcher's reasoning is plainly retaliatory and is shrouded in unconvincing pre-text.

76.     In addition, rather than supervising Ms. Walker herself, as Ms. Gallo-Kotcher informed Ms. Walker she would, Ms. Gallo-Kotcher has had Mr. Miyashiro assign Ms. Walker

work on numerous occasions.  Ms. Gallo-Kotcher has decided that Mr. Miyashiro would be given more responsibility than his Black female colleagues following Ms. Walker's complaints.

77.    Further, MTA has provided Ms. Walker with no assurances that she will not be required to share her workplace with her abuser, Muallem.

78.    These retaliatory actions have exacerbated an already abusive workplace, making it exceedingly difficult for Ms. Walker to concentrate on her work, instead causing her to worry about her every decision.  Ms. Walker finds it difficult to muster a smile and is jumpy and easily startled at work, as she is forced to maintain a positive façade.

79.    Following Ms. Walker's February 4th Workplace Violence complaint, the MTA conducted an investigation.  Unsurprisingly, following the investigation, the MTA informed Ms. Walker that there was "insufficient evidence to substantiate Ms. Walker's allegations" without providing any justification or information as to how the investigation was conducted, who was interviewed or what evidence was collected.

80.    Although the report is dated July 31, 2020, the report was only provided to Ms. Walker in October 2020.

81.    On August 18, 2020, during a call between Ms. Walker and Union President Wayne Joseph, Mr. Joseph mentioned that the MTA and TBTA had not disciplined Muallem for striking Ms. Walker.  Mr. Joseph told Ms. Walker that the failure to discipline managers for this kind of conduct is what leads to disparate treatment of employees.

82.    In the wake of abusive workplace conduct – first by Muallem and then by Ms. Gallo-Kotcher – Ms. Walker has suffered stress, anxiety, panic attacks, heart palpitations and regularly has nightmares that involve Muallem.

**FIRST CAUSE OF ACTION**
**(Discrimination and Harassment in Violation of 42 U.S.C. Section 1981 ("Section 1981"))**
*Against All Defendants*

83.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

84.     Defendants have discriminated against Plaintiff on the basis of her race and/or color in violation of Section 1981 by denying her the same terms and conditions of employment available to non-Black employees, including, but not limited to, subjecting her to disparate working conditions and denying her terms and conditions of employment equal to that of non-Black employees, including her termination.

85.     As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, for which she is entitled to an award of damages.

86.     As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of damages.

87.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)
### *Against All Defendants*

88.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

89.     Defendants retaliated against Plaintiff by, *inter alia*, subjecting Plaintiff to adverse actions, including exacerbating an already abusive and hostile work environment, because she engaged in protected activities under § 1981.

90.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

91.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

92.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of § 1981, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (14th Amendment Equal Protection Violation Under 42 U.S.C. Section 1983)
### *Against All Defendants*

93.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

94.     By the actions detailed above, among others, Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1983 by, *inter alia*, denying her rights, privileges or immunities guaranteed under and in violation of the Equal Protection Clause

of the United States Constitution, including denying her the same terms and conditions of employment available to non-Black employees, subjecting her to disparate working conditions.

95.    Defendants also violated Section 1983 by retaliating against Plaintiff for engaging in protected complaints regarding her continuous discrimination.

96.    As detailed above, at all times, Defendants acted intentionally, knowingly or recklessly, to deprive Plaintiff of her constitutionally protected rights.  Defendants further acted with the knowledge that their conduct, decisions and patterns of discrimination were reasonably likely to result in a deprivation of Plaintiff's constitutionally protected rights.

97.    As detailed above, Defendants acted with malice, evil motive and reckless indifference to Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

98.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1983, Plaintiff has suffered, and continues to suffer, emotional distress, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, for which she is entitled to an award of damages.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

99.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

100.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender, including but not limited to, subjecting her to workplace violence and a hostile work environment.

101.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

102.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

103.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

104.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

105.    Defendants have retaliated against Plaintiff on the basis of her protected activity, in violation of the NYSHRL, by subjecting Plaintiff to adverse actions, including exacerbating an already abusive and hostile work environment, because she engaged in protected activity.

106.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as

compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

107.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

108.     Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Aiding and Abetting Violation of the NYSHRL)**
*Against Defendant Muallem and Defendant Gallo-Kotcher*

109.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

110.     Defendants Muallem and Gallo-Kotcher knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

111.     As a direct and proximate result of Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting in violation of NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

112.     Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting constitutes malicious, willful, wanton, and reckless violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

### SEVENTH CAUSE OF ACTION
**(Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

113.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

114.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender, including but not limited to, subjecting her to workplace violence and a hostile work environment.

115.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

116.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

117.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
#### *Against All Defendants*

118.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

119.    Defendants have retaliated against Plaintiff on the basis of her protected activity, in violation of the NYCHRL, by subjecting Plaintiff to adverse actions, including exacerbating an already abusive work environment, because she engaged in protected activity.

120.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

121.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

122.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### (Aiding and Abetting Violation of the NYCHRL)
#### *Against Defendant Muallem and Defendant Gallo-Kotcher*

123.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

124.     Defendants Muallem and Gallo-Kotcher knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

125.     As a direct and proximate result of Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting in violation of NYCHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

126.     Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting constitutes malicious, willful, wanton, and reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### TENTH CAUSE OF ACTION
**(Gender-Motivated Violence Pursuant to NYC Admin. Code)**
***Against Defendant Muallem***

127.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

128.     The above-described conduct of Defendant Muallem, including, but not limited to, Defendant Muallem striking Plaintiff, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by the New York City Gender Motivated Violence Act, NYC Admin. Code § 8-903 (2017), ("GMVA").

129.     The above-described conduct of Defendant Muallem, including, but not limited to, Defendant Muallem striking and berating Plaintiff, constitutes a "crime of violence" against Plaintiff motivated:  (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

130.    Defendant Muallem committed a "crime of violence" against Plaintiff because she is a woman and, at least in part, because he has an animus towards women.   Defendant Muallem's gender-motivated animus towards women is demonstrated by, among other things, his violent treatment of women.

131.    As a direct and proximate result of the aforementioned gender-motivated violence, Plaintiff has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

132.    Defendant Muallem's gender-motivated violence against Plaintiff entitles her to punitive damages and an award of attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION
**(Assault)**
***Against Defendant Muallem and Defendant MTA***

133.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

134.    The violent acts committed intentionally by Defendant Muallem against Plaintiff without her consent, including but not limited to, striking Plaintiff, created a reasonable apprehension in Plaintiff of immediate harmful or offensive contact with Plaintiff's person.

135.    Defendant MTA is liable under the doctrine of *respondeat superior* because Defendant Muallem was acting in the scope of his employment with the MTA when he created a reasonable apprehension in Plaintiff of harmful or offensive contact with Plaintiff's person.

136.    As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will continue to sustain, *inter alia*, physical injury, monetary damages,

pain and suffering, psychological and emotional distress, humiliation and loss of career fulfillment.

137.    Defendant Muallem's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

**TWELFTH CAUSE OF ACTION**
**(Battery)**
***Against Defendant Muallem and Defendant MTA***

138.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

139.    The violent acts committed intentionally by Defendant Muallem against Plaintiff and without her consent, including but not limited to, striking Plaintiff, constitutes a harmful and offensive contact to Plaintiff's person.

140.    Defendant MTA is liable under the doctrine of *respondeat superior* because Defendant Muallem was acting in the scope of his employment with the MTA when he committed harmful and offensive contact with Plaintiff's person.

141.    As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will sustain in the future, *inter alia*, physical injury, monetary damages, pain and suffering, psychological and emotional distress, mental anguish, embarrassment, humiliation and loss of career fulfillment.

142.    Defendant Muallem's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.     An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the practices complained of herein and any further retaliation and/or tortious conduct;

C.     An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all past and future monetary and/or economic damages;

D.     An award of liquidated damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress and physical illness;

F.     An award of punitive damages against Defendants, in an amount to be determined at trial;

G.     Prejudgment interest on all amounts due;

H.     An award of costs that Plaintiff have incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 19, 2021
      New York, New York                         Respectfully submitted,

                                        **WIGDOR LLP**

By: _____
                                        Jeanne M. Christensen
                                        Lindsay M. Goldbrum
                                        David A. Schmutzer

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone:  (212) 257-6800
                                        Facsimile:   (212) 257-6845
                                        jchristensen@wigdorlaw.com
                                        lgoldbrum@wigdorlaw.com
                                        dschmutzer@wigdorlaw.com

                                        *Counsel for Plaintiff*