**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | |
|---|---|
| KELLIE WALKER, : | |
| : | Civil Action No.: 21-cv-00474 |
| Plaintiff, : | |
| : | |
| v. : | **SECOND AMENDED** |
| : | **COMPLAINT** |
| TRIBOROUGH BRIDGE AND TUNNEL : | |
| AUTHORITY, d/b/a METROPOLITAN : | |
| TRANSPORTATION AUTHORITY BRIDGES : | **Jury Trial Demanded** |
| AND TUNNELS, VICTOR MUALLEM, and : | |
| SHARON GALLO-KOTCHER, in their : | |
| individual and professional capacities. : | |
| : | |
| Defendants. : | |

-------------------------------------------------------------X

Plaintiff Kellie Walker ("Plaintiff" or "Ms. Walker"), by and through her attorneys, Wigdor LLP, as and for her Second Amended Complaint against Defendants Triborough Bridge and Tunnel Authority, d/b/a Metropolitan Transportation Authority Bridges and Tunnels ("TBTA"), an affiliate agency of the Metropolitan Transportation Authority (together, the "MTA"), Victor Muallem ("Muallem"), in his individual and professional capacities, and Sharon Gallo-Kotcher ("Gallo-Kotcher") in her individual and professional capacities, (collectively the "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.    Kellie Walker, a 50-year-old Black woman, single mother and attorney has been a dedicated civil servant for over twelve years.

2.    Unfortunately, at the MTA, Ms. Walker has experienced and continues to be subjected to a violent and hostile work environment.

3.    As detailed below, Victor Muallem, a 60-year-old white male that supervises Ms. Walker, regularly subjected Ms. Walker to aggressive and abusive behavior. For example, one

day in November 2019, Muallem stormed into Ms. Walker's office and screamed at her with the door open so that the entire office could hear.

4.      On January 8, 2020, Muallem openly berated Ms. Walker in front of colleagues and clients.  During this incident, Muallem was so enraged that spit flew out of his mouth.

5.      Horrifically, on February 3, 2020, during an arbitration hearing in New York City, Muallem became so mad at Ms. Walker that he hurled back his arm and physically hit Ms. Walker.   Unbelievably, Ms. Walker was in the middle of cross-examining a witness when Muallem hit her.  Multiple people at the hearing saw the assault and battery including witnesses, other attorneys and the arbitrator.  Stunned, shocked, humiliated and in pain, Ms. Walker ran out of the hearing as soon as she was finished.

6.      The aftermath of the trauma caused Ms. Walker to take medical leave.  Since then, Ms. Walker frequently suffers from periods of incessant crying, nightmares, heart palpitations, panic attacks, stress and anxiety.  Because of the assault and battery by Muallem, Ms. Walker now is under regular psychiatric care.

7.      Worse, although Ms. Walker reported the incident to the police, the TBTA and the MTA, Defendants have done nothing.  Almost a year later, Muallem continues to work at the MTA in a supervisory attorney position.

8.       Ms. Walker is expected to work as if nothing ever happened.  She lives in fear of working in the same courtroom as Muallem.

9.      Outrageously, since the physical assault, the TBTA has allowed workplace retaliation to *intensify* against Ms. Walker.

10.     It is a documented reality in our country that Black women experience physical and sexual violence at exceedingly high rates as compared to White women.  Black women also

are disproportionately more likely to deal with racism and stereotypes when seeking help, such as by contacting the police and, as here, from seeking help from their employer.

11.     Had Ms. Walker been a male attorney working under Muallem rather than a female, and especially as a Black female, Muallem never would have physically assaulted her.

12.     Muallem did it – incredibly during the middle of an ongoing arbitration hearing – because she was a woman and he knew he would get away with it.

13.     True to his assumptions, the TBTA and the MTA are letting Muallem get away with it and worse, doing nothing to remedy what happened.

14.     It is no excuse that the reputation of the MTA's culture is one that is rife with toxic behavior and violence.  Numerous other MTA employees have complained of workplace violence incidents.  As in Ms. Walker's case, these incidents are completely ignored.  MTA ensures that no accountability or action is taken in response.

15.     Such total marginalization and utter lack of accountability by the TBTA and MTA has increased Ms. Walker's suffering and harm.

16.     For years because of Muallem's prior behavior, Gallo-Kotcher, the TBTA and the MTA knew and were aware of his propensity to publicly demean, marginalize and threaten female employees, including those under his supervision.  But Defendants negligently and recklessly opted to do nothing.  Not surprisingly, Muallem, emboldened by a lack of discipline for his unlawful behavior, intensified his vitriol.

17.     Defendants could have prevented the assault and battery experienced by Ms. Walker.  Instead, they negligently, recklessly or intentionally opted to double-down, allowing Muallem to carry on unabated, while inflicting constant retaliation on Ms. Walker, exacerbating

the emotional stress from which she suffers and continues to suffer as a result of the assault, battery and other abuses at the hands of her supervisors.

18.     Even in the aftermath of the racist murders of George Floyd and Breonna Taylor and the racist shooting of Jacob Blake and the ensuing global outrage and protests over excessive violence inflicted on Black citizens, Defendants failed to pause and examine what happened on February 3, 2020.   On that day – in the middle of a hearing with seven people present, a supervisory white male, with a history of uncontrolled temper, inflicted senseless violence on Ms. Walker, a junior Black female, as she was in the process of cross-examining a witness.

19.     The TBTA and the MTA – fueled with the hard-earned money of New York State taxpayers failed to take this moment, a second opportunity, to reflect on the assault and battery and to do the right thing.   Unfortunately, time and time again, the TBTA and the MTA have utterly failed their female employees and their employees of color.

20.     Most troubling, as set forth below, the TBTA and the MTA have, in true hypocritical fashion, actively sought to *silence* Ms. Walker because she dared speak up about the workplace violence at the hands of her white male superior.

21.     No female employee should fear speaking up about being physically hit by her boss.   Defendants must be held accountable for this atrocious, unacceptable and unlawful conduct.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions under 42 U.S.C. §§ 1981 and 1983 and 42 U.S.C. §§ 2000e *et seq*.   The Court has supplemental jurisdiction over Plaintiff's claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

4

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

24.     Plaintiff Kellie Walker is an employee of the MTA.  Ms. Walker was at all relevant times an "employee" of Defendant MTA under all relevant statutes.  Ms. Walker is a resident of the State of New York.

25.     Defendant MTA is a domestic government entity that is headquartered at 2 Broadway, New York, New York 10004.  At all relevant times, Defendant MTA met the definition of "employer" under all applicable statutes.

26.     Defendant Victor Muallem is a Director of Labor Relations of the MTA.  Mr. Muallem had the authority to direct Plaintiff's work activities, assign her job responsibilities and monitor her performance.  Accordingly, at all relevant times, Muallem was a "supervisor" within the meaning of all applicable statutes.  Upon information and belief, Muallem is a resident of the State of New York.

27.     Defendant Sharon Gallo-Kotcher is the Vice President of Labor Relations of the MTA.  Gallo-Kotcher had the authority to direct Plaintiff's work activities, assign her job responsibilities and monitor her performance.  Accordingly, at all relevant times, Gallo-Kotcher was a "supervisor" within the meaning of all applicable statutes.  Upon information and belief, Gallo-Kotcher is a resident of the State of New York.

## ADMINISTRATIVE REQUIREMENTS

28.     Prior to filing of the Complaint, Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").

29.     On or about July 28, 2021, the EEOC issued Plaintiff a Notice of Right to Sue.

30.     Pursuant to New York City Human Rights Law ("NYCHRL") § 8-502, Plaintiff served a copy of the Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

31.     Plaintiff timely served a notice of claim on the City of New York within 90 days after her tort claims arose.  More than 30 days have elapsed since the notice of claim was filed, and the municipal employee Defendants have failed to satisfy Plaintiff's claim.

32.     Plaintiff has complied with any and all other prerequisites to filing this action.

## FACTUAL ALLEGATIONS

33.     Kellie Walker is a 50-year-old Black woman, single mother and an accomplished attorney.

34.     She completed her undergraduate studies at Boston University ("BU") – Wheelock College in 1993, graduating *magna cum laude*.  She received her Masters of Social Work from BU in 1994 and graduated from Boston College Law School in 1998.

35.     After Ms. Walker graduated law school, she served as an associate at several law firms from 2000 until 2008, specializing in labor and employment.

36.     Ms. Walker, however, felt a draw to public service and decided to dedicate herself to government work.  From 2008 to 2018, she served in the New York City Department of Education's Office of Labor Relations and Collective Bargaining.

37.     Since September 2018 through the present, Ms. Walker has worked for the MTA's Office of Labor Relations, representing clients in complex matters arising under collective bargaining, including arbitration.

38.     Three attorneys at the MTA report directly to Muallem: Ms. Walker, Alexandria Jean-Pierre and Eduardo Miyashiro.  Ms. Jean-Pierre, like Ms. Walker, is a Black woman and is approximately 40 years old.  Mr. Miyashiro, a man in his late 40s, is not Black.

39.     Muallem is a white male and about 60 years old.  Importantly, he is physically intimidating, weighing at least 250 pounds.

40.     Muallem has worked at the MTA since approximately 2014.  Prior to working at the MTA, Muallem worked at the New York City Department of Education.

41.     Gallo-Kotcher is a white female and is about 61 years old.

42.     Within one month of starting at the MTA, Gallo-Kotcher told Ms. Walker that she had been the subject of an internal Equal Employment Opportunity ("EEO") complaint filed by a male MTA employee who is a person of color.  This employee had an office near Gallo-Kotcher's office.

43.     Gallo-Kotcher told Ms. Walker that before Ms. Walker started at the MTA, there was a young black female intern.  When Gallo-Kotcher found out that this woman went to a prestigious college, Gallo-Kotcher asked, "well how did you get into there?"  Gallo-Kotcher told Ms. Walker that the person who reported her believed that Gallo-Kotcher was implying that she

was surprised that this young black female intern would be able to get into the prestigious college.

44.     When Ms. Walker asked Ms. Jean-Pierre if she knew about this complaint, she said, "Yes, I am well aware."

45.     Gallo-Kotcher told this story on numerous occasions, and on at least one occasion asked Veronica Campbell, a Black MTA employee, to affirm for Gallo-Kotcher that Ms. Campbell understood that Gallo-Kotcher would "never" make such an offensive implication.

46.     In or about the Spring of 2019, the tenor of Ms. Walker's working relationship with Muallem, her direct report, began to change dramatically when Muallem began to direct severe animosity towards the two females on his team, Ms. Walker and Ms. Jean-Pierre.

47.     Muallem did not direct this animosity towards his one male report, Mr. Miyashiro.

48.     Similarly, Mr. Miyashiro was viewed by his colleagues as the right-hand man of Muallem, who clearly showed Mr. Miyashiro favor.  As a result, Mr. Miyashiro, though hired at a level equal to that of Ms. Walker and Ms. Jean-Pierre, is viewed as their superior.  It soon became clear to Ms. Walker that Mr. Miyashiro was being groomed for a supervisory position.

49.      Mr. Miyashiro's status at TBTA quickly elevated, and he surpassed Ms. Walker and Ms. Jean-Pierre.  For example, Mr. Miyashiro was allowed to go to higher level meetings where Ms. Walker and Ms. Jeanne-Pierre were excluded.

50.     This favoritism showed towards the one employee who was not a Black single mother helped Mr. Miyashiro escape the wrath of Muallem.

51.     In April 2019, Muallem began to email Ms. Walker unwarranted and gratuitous criticisms about Ms. Walker's work product, copying Gallo-Kotcher.  These highly critical

emails continued with frequency through at least December 2019.  Furthermore, during in-office interactions with Ms. Walker, Muallem would make belittling comments to Ms. Walker and would often roll his eyes at her.

52.     That summer, in or around July 2019, Ms. Walker requested a few days off. Muallem initially denied her request, explaining that Ms. Walker needed to prepare for arbitration hearings scheduled *three months later*, in October.  Muallem only relented and approved Ms. Walker's request for time off after Mr. Miyashiro intervened and explained to Muallem that there was indeed enough time for Ms. Walker to take time off and still prepare for the hearings.

53.     On another occasion, on or around November 2019, Muallem opened the door to Ms. Walker's office, stormed in and engaged the doorstop so that it remained open.  With his 250-pound girth, storming into her office was intimidating and alarming.  Then, so the entire office could hear him, he screamed at Ms. Walker at the top of his lungs, criticizing her work. Ms. Walker summoned the wherewithal to ask Muallem to please close the door so that she would not have to be humiliated in front of all of her colleagues.

54.     She never witnessed Muallem act in such a disparaging way towards his male report, Mr. Miyashiro.

55.     The animosity that Muallem directed toward Ms. Walker weighed heavily on her and made it increasingly difficult for her to do her job.

56.     Muallem's behavior escalated.  On January 8, 2020, during an arbitration hearing, Muallem verbally abused Ms. Walker.  Before the arbitration was set to begin, Muallem asked Ms. Walker whether she could give the opening statement.  Ms. Walker agreed to do so.  When

she explained what she would cover in the opening statement, Muallem interjected and shouted at her, insisting that she instead focus on other points.

57.     As Ms. Walker started to give her opening statement, Muallem interrupted her repeatedly and insisted – audibly so that everyone else at the proceeding could hear him – that she incorporate details from a prior case that Muallem, but not Ms. Walker, had worked on.

58.     Muallem's temper escalated, and he further yelled, berated and belittled Ms. Walker in front of the MTA's clients, Mark Klosner and Erik Horman; consultant James Fortunato; the TBTA's Superior Officers Benevolent Association ("SOBA") Board; opposing counsel, Christopher Rothemich; and Arbitrator John Sands.

59.     Muallem's aggressive behavior and yelling at Ms. Walker – in front of numerous men - was meant to imply that he believed she was incompetent.  It also shows that as a white male, he believed it was acceptable for him to subject a junior Black female employee to such horrific discrimination and humiliation.

60.     His yelling became so intense and aggressive that spit was flying out of his mouth.

61.     Had Ms. Walker been a male, Muallem never would have engaged in such mistreatment.

62.     At all relevant times, Ms. Walker never witnessed Muallem treat a junior white employee, male or female, in such an unlawful, discriminatory manner.

63.     Still in the middle of Ms. Walker's opening statement, because Muallem would not stop interrupting, Arbitrator Sands called Ms. Walker and Muallem, as well as Mr. Rothemich, out of the room to discuss Muallem's behavior.  Arbitrator Sands told Muallem, in the presence of Mr. Rothemich, that Ms. Walker was "doing a wonderful job" and that

Muallem's incessant interruptions were preventing Ms. Walker from performing at the absolute best of her abilities.

64.     This was not the first time Muallem had done exactly this to another Black, female employee during an arbitration.  In that case, the arbitrator also was forced to halt the proceedings to say that Muallem was flustering her unnecessarily and his conduct was preventing the attorney from performing at her best.

65.     Following the hearing, Mr. Klosner told Ms. Walker that he was "sorry [Ms. Walker] had to go through that."  Mr. Rothemich also subsequently spoke with Ms. Walker and told her that he "didn't know what all that was about" and that the incident was "something else."

66.     Ms. Walker – though thankful that Arbitrator Sands had supported her – knew that it was only a matter of time before she would pay the price because Muallem, who was embarrassed by Arbitrator Sands' intervention, in true sexual harasser fashion would wrongly blame her for what happened and, thereby, escalate his actions against her.

67.     This is exactly what happened.  Less than a month later, on February 3, 2020, Ms. Walker was physically hit by Muallem during an arbitration hearing at the American Arbitration Association.

68.     Specifically, during Ms. Walker's cross-examination of a witness, Christina Lampropoulos, Muallem, who was sitting next to Ms. Walker, became irate and struck Ms. Walker's left arm with the back of his hand.

69.     The assault and battery, during a hearing in front of opposing counsel and witnesses, left Ms. Walker in physical and emotional shock, embarrassed her and left visible bruising.

70.     Specifically, the assault and battery occurred in the presence of multiple witnesses, including members of the SOBA Board, Arbitrator Dan Brent, Christopher Coradin, a Superintendent of the TBTA, Ms. Lampropoulos and the court reporter.

71.     Ms. Walker never witnessed the 250-pound Muallem hit or physically strike a male employee.

72.     Indeed, it is a documented reality in our country that Black women experience physical and sexual violence at exceedingly high rates as compared to white women, much less than white men.

73.     Had Ms. Walker been a white male, Muallem never would have physically assaulted her.  Had she been a male lawyer of any skin color or national origin, Muallem never would have physically hit her.

74.     Muallem physically assaulted her because she is a Black woman, and he believed he could get away with it.  After all, the TBTA and MTA negligently and recklessly let him get away with all of his prior harassing misconduct.

75.     Although she was in pain and humiliated, Ms. Walker tried not to cry, scream in pain or run out of the room.  Ms. Walker sat there even though she wanted to run and hide from Muallem.

76.     After the hearing concluded, Ms. Walker went into a nearby hearing room and hid in a closet.  From there, Ms. Walker called her co-worker, Ms. Jean-Pierre, to tell her what had happened.  Ms. Walker was so distraught that she could not express how she really felt to Ms. Jean-Pierre because she was afraid that she would break down, cry and shortly after have to face her assailant, Muallem, as well as colleagues and opposing attorneys, with tears streaming down her face.

77.     Still in shock and feeling pain in her arm, Ms. Walker found Muallem speaking with opposing counsel Alex Kaminski to schedule hearing dates.  Ms. Walker summoned the courage to participate in the discussion regarding scheduling.

78.     After dates had been scheduled, Ms. Walker could not bear being in Muallem's presence any longer.  She told Muallem that she was ready to leave.

79.     Muallem decided to leave, too.  Ms. Walker was forced to ride the elevator down with Muallem.  After Ms. Walker and Muallem exited the elevator, Ms. Walker informed Muallem that she could walk to her car herself.  Muallem then said that he would take the back way out of the building.

80.     Ms. Walker had been to this office building with Muallem numerous times.  He had never exited the back way before, reflecting Muallem's understanding that he had done something gravely wrong.

81.     Ms. Walker went back to her office building, entered the building, clocked out and drove home.  Ms. Walker was too distraught to go up to her office.  Ms. Walker cried the entire way home.  The only moments when she was able to suppress her anguish was when she was caring for her daughter.

82.     The next day, on February 4th, Ms. Walker submitted a Workplace Violence Incident form to Gallo-Kotcher regarding Muallem striking her.

83.     The day after that, on February 5th, Ms. Walker filed an Incident Report with the New York City Police Department recounting the events of February 3rd.  At the police station, Ms. Walker showed the bruise on her left arm to the officer who took down her report.  The report stated that Ms. Walker was "seriously alarmed" and that she "fears for her safety."

84.     On February 6th, Ms. Walker obtained a medical note from her physician, advising Ms. Walker to take a temporary leave of absence from work.

85.     Furthermore, as any reasonable woman in her situation would do, Ms. Walker told Gallo-Kotcher that she could not be in physical proximity to Muallem.  Nevertheless, the day after Muallem struck Ms. Walker, the MTA and Gallo-Kotcher expected Ms. Walker to show up at work and report to Muallem, business as usual.

86.     The MTA and Gallo-Kotcher further expected Ms. Walker, just days after she was struck by Muallem, to conduct a trial with Muallem.

87.     In fact, Ms. Walker had to proactively inform Gallo-Kotcher that she could not do this because she was experiencing panic attacks, breaking down sobbing and shaking at the thought of being in a room with Muallem.  Every time Ms. Walker would enter the MTA office building or walk through the building's hallway, her heart would race as she remembered Muallem striking her and considered whether she would run into him.

88.     Toward the end of February, Ms. Walker retained counsel and, through her counsel, sent a letter of representation to the MTA.  At that point, the MTA – with Gallo-Kotcher leading the charge – began a retaliation campaign against Ms. Walker.

89.     Gallo-Kotcher began intensely micromanaging Ms. Walker at work.  For instance, Gallo-Kotcher began to comment on the times Ms. Walker – a longtime employee – would clock in and out of work.  Gallo-Kotcher had never commented on Ms. Walker's time prior to her report.

90.     Indeed, TBTA and Gallo-Kotcher purposefully have made Ms. Walker aware of their excessive monitoring of her time.  By way of example only, Ms. Walker received the following from Patrick Smith, a human resources employee ("HR"):

[Raina Bertram] sent you a routine inquiry regarding the Kronos entries.  Please be advised that any leave taken since February 4, 2020 (i.e., hours less than 8 in any given work day) will be recorded and treated as paid administrative leave until further notice.  The timekeeping unit will update internal records accordingly, so no further action is required on your part concerning your timecard at this time.

91.     On one occasion, on February 27, 2020, this intense micromanagement flustered Ms. Walker at a work meeting.  Gallo-Kotcher exploited this moment to excessively reprimand Ms. Walker about a purported "mistake" Ms. Walker had made in September 2019, five months prior.

92.     Further evidencing her retaliatory behavior, on May 28th, Gallo-Kotcher sent Ms. Walker an email demanding that Ms. Walker create a report updating Gallo-Kotcher on the status of all of her cases ("workplans") *within the hour*.  This was not standard practice. Notably, Gallo-Kotcher did not send a similar message to Ms. Walker's co-worker, who is not a Black woman, has Ms. Walker's same rank at work and has a caseload nearly identical to Ms. Walker's.  Moreover, the kind of work Ms. Walker completes on a day-to-day basis is highly similar to what this same co-worker does.

93.     Gallo-Kotcher has since insisted that other MTA employees under her supervision also complete these workplans.  However, she will incessantly email Ms. Walker before the workplan is due.  Gallo-Kotcher does not similarly badger other employees.

94.     Moreover, on December 16, 2020 Gallo-Kotcher emailed Ms. Walker, directing her to suddenly attend a "Case Status Review" of her disciplinary cases "before we all started holiday vacations" to "review status of the cases."

95.     This status meeting was called out of the blue, giving Ms. Walker less than one hour to prepare – on a day with an impending snowstorm.

96.     In November 2020, as COVID-19 cases again began to rise in New York, Gallo-Kotcher suddenly instructed Ms. Walker to physically go into the office to conduct *virtual* litigation, including conferences.   Ms. Walker suffers from chronic lupus, an underlying condition putting her at greater risk of serious illness or death if she were infected with COVID-19.

97.     Apart from the risk related to the COVID-19 pandemic, forcing Ms. Walker to go into the office creates the risk that Ms. Walker will have to cross paths with Muallem.   Gallo-Kotcher's purported rationale was "ease of collaboration," explaining that exchanging emails during these proceedings "just doesn't work."   But Gallo-Kotcher's reasoning is unsound: Gallo-Kotcher initially permitted Ms. Walker to virtually conduct conferences from home and so it is unclear what would be accomplished by Ms. Walker physically going to the office to *virtually* conduct proceedings held *via videoconference*.   Gallo-Kotcher's purported justification is plainly retaliatory and is shrouded in unconvincing pre-text.

98.     In addition, rather than supervising Ms. Walker herself, as Gallo-Kotcher informed Ms. Walker she would, Gallo-Kotcher has had Mr. Miyashiro assign Ms. Walker work on numerous occasions.   Gallo-Kotcher has decided that Mr. Miyashiro would be given more responsibility than his Black female colleagues following Ms. Walker's complaints.

99.     Further, MTA has provided Ms. Walker with no assurances that she will not be required to share her workplace with her abuser, Muallem.

100.     Gallo-Kotcher's demands are meant to dissuade further protected complaints by Ms. Walker and other MTA employees similarly situated to her.

101.     In fact, since Ms. Walker sent her letter of representation, Gallo-Kotcher has started to make references to Muallem both directly to Ms. Walker and to others in Ms. Walker's

presence.  Gallo-Kotcher purposefully references Muallem in Ms. Walker's presence to provoke her.  Such blatant micro aggressions invariably cause Ms. Walker to shake, feel anxious and experience other symptoms of emotional distress.

102.    In another incident, on or around April 14, 2021, an MTA employee emailed Ms. Walker asking for a recent decision-and-order.  Ms. Walker emailed Gallo-Kotcher to ask whether she should provide this employee with the order he was requesting.  Gallo-Kotcher nastily responded, "**What the hell is this?**"  Ms. Walker explained again what the employee was asking for, and Gallo-Kotcher responded that Ms. Walker should send the decision-and-order.

103.    On April 15th, Ms. Walker then called the MTA employee to ask for additional information.  The employee lost his temper and screamed, "I'm tired of banging my head against the wall!" and hung up.

104.    Ms. Walker told Gallo-Kotcher that the employee had screamed at her.  Gallo-Kotcher said she would talk to his supervisor.  On or about April 22, 2021, Ms. Walker inquired whether Gallo-Kotcher had followed up with the employee's supervisor.

105.    Gallo-Kotcher responded that she had spoken to the employee's immediate supervisor, that the supervisor had asked her subordinate whether he in fact had yelled at Ms. Walker.  According to Gallo-Kotcher, the subordinate denied doing so when questioned by his immediate supervisor.

106.    Unbelievably, Gallo-Kotcher told Ms. Walker that she was going to give the screaming employee "the benefit of the doubt."

107.    This incident shows that the MTA does not even know or does not care to acknowledge or address even the most basic sort of abusive workplace behavior.

108.    These retaliatory actions have exacerbated an already abusive workplace, making it exceedingly difficult for Ms. Walker to concentrate on her work, instead causing her to worry about her every decision.  Ms. Walker finds it difficult to muster a smile and is jumpy and easily startled at work (whether working from home or in-office), as she is forced to maintain a positive façade.

109.    Ms. Walker is not alone in facing condescending, sexist conduct by Muallem – behavior that Gallo-Kotcher and other higher-ups at the MTA brush under the rug.

110.    Women who work for the MTA and its union are regularly addressed by Muallem in ways that he would never address men (and particularly white men).  It is well-understood at the MTA that Muallem believes his female colleagues should be subservient to him.

111.    Male and female MTA employees will regularly remark that Muallem speaks more rudely and condescendingly to female MTA employees than he does to men.

112.    In addition, Muallem – and other high-ranking male MTA employees – will regularly describe women as "irate," "aggressive" or "rude" when they are acting simply acting professionally and doing their jobs.  These terms, obviously shrouded in gender stereotype, carry a sexist overtone.

113.    Women have regularly quit their employment from the MTA or requested transfers so that they do not have to endure the condescending and demeaning way in which Muallem interacts with them.

114.    Following Ms. Walker's February 4th Workplace Violence complaint, the MTA purported to conduct an investigation.  Unsurprisingly, following the investigation, the MTA informed Ms. Walker that there was "insufficient evidence to substantiate Ms. Walker's

allegations" without providing any justification or information as to how the investigation was conducted, who was interviewed or what evidence was collected.

115.    Although the report is dated July 31, 2020, the report was only provided to Ms. Walker in October 2020.

116.    On August 18, 2020, during a call between Ms. Walker and Union President Wayne Joseph, Mr. Joseph mentioned that the MTA and TBTA had not disciplined Muallem for striking Ms. Walker.  Mr. Joseph told Ms. Walker that the failure to discipline managers for this kind of conduct is what leads to disparate treatment of employees.

117.    In the wake of abusive workplace conduct – first by Muallem and then by Gallo-Kotcher – Ms. Walker has suffered stress, anxiety, panic attacks, heart palpitations and regularly has nightmares that involve Muallem.

118.    There is no end in sight for Ms. Walker's horrific workplace environment.

**FIRST CAUSE OF ACTION**
**(Discrimination and Harassment in Violation of 42 U.S.C. Section 1981 ("Section 1981"))**
***Against All Defendants***

119.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

120.    Defendants have discriminated against Plaintiff on the basis of her race and/or color in violation of Section 1981 by denying her the same terms and conditions of employment available to non-Black employees, including, but not limited to, subjecting her to disparate working conditions and denying her terms and conditions of employment equal to that of non-Black employees, including her termination.

121.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer,

monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, for which she is entitled to an award of damages.

122.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of damages.

123.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of Section 1981)**
***Against All Defendants***

124.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

125.    Defendants retaliated against Plaintiff by, *inter alia*, subjecting Plaintiff to adverse actions, including exacerbating an already abusive and hostile work environment, because she engaged in protected activities under Section 1981.

126.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

127.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

128.   Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(14th Amendment Equal Protection Violation Under 42 U.S.C. Section 1983)**
***Against All Defendants***

129.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

130.   By the actions detailed above, among others, Defendants have discriminated against Plaintiff on the basis of her race in violation of the Equal Protection Clause by, *inter alia*, denying her rights, privileges or immunities guaranteed under and in violation of the Equal Protection Clause of the United States Constitution, including denying her the same terms and conditions of employment available to non-Black employees similarly situated to Plaintiff in all material respects and by subjecting her to disparate working conditions.

131.   Defendants also violated the Equal Protection Clause by retaliating against Plaintiff for engaging in protected complaints regarding her continuous discrimination.

132.   As detailed above, at all times, Defendants acted intentionally, knowingly or recklessly, to deprive Plaintiff of her constitutionally protected rights.  Defendants further acted with the knowledge that their conduct, decisions and patterns of discrimination were reasonably likely to result in a deprivation of Plaintiff's constitutionally protected rights.

133.   As detailed above, Defendants acted with malice, evil motive and reckless indifference to Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

134.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the Equal Protection Clause, Plaintiff has suffered, and continues to suffer,

emotional distress, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, for which she is entitled to an award of damages.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

135.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

136.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender, including but not limited to, subjecting her to workplace violence and a hostile work environment.

137.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

138.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

139.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
*Against All Defendants*

140.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

141.    Defendants have retaliated against Plaintiff on the basis of her protected activity, in violation of the NYSHRL, by subjecting Plaintiff to adverse actions, including exacerbating an already abusive and hostile work environment, because she engaged in protected activity.

142.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

143.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

144.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Violation of the NYSHRL)
*Against Defendant Muallem and Defendant Gallo-Kotcher*

145.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

146.    Defendants Muallem and Gallo-Kotcher knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

147.    As a direct and proximate result of Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting in violation of NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

148.    Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting constitutes malicious, willful, wanton and reckless violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

149.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

150.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender, including but not limited to, subjecting her to workplace violence and a hostile work environment.

151.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

152.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

153.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

154.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

155.    Defendants have retaliated against Plaintiff on the basis of her protected activity, in violation of the NYCHRL, by subjecting Plaintiff to adverse actions, including exacerbating an already abusive work environment, because she engaged in protected activity.

156.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

157.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

158.     Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### NINTH CAUSE OF ACTION
**(Aiding and Abetting Violation of the NYCHRL)**
***Against Defendant Muallem and Defendant Gallo-Kotcher***

159.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

160.     Defendants Muallem and Gallo-Kotcher knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

161.     As a direct and proximate result of Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting in violation of NYCHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

162.     Defendants Muallem's and Gallo-Kotcher's unlawful aiding and abetting constitutes malicious, willful, wanton, and reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### TENTH CAUSE OF ACTION
**(Gender-Motivated Violence Pursuant to NYC Admin. Code)**
***Against Defendant Muallem***

163.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

164.     The above-described conduct of Defendant Muallem, including, but not limited to, Defendant Muallem striking Plaintiff, constitutes a "crime of violence" and a "crime of

violence motivated by gender" against Plaintiff as defined by the New York City Gender Motivated Violence Act, NYC Admin. Code § 8-903 (2017), ("GMVA").

165.   The above-described conduct of Defendant Muallem, including, but not limited to, Defendant Muallem striking and berating Plaintiff, constitutes a "crime of violence" against Plaintiff motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

166.   Defendant Muallem committed a "crime of violence" against Plaintiff because she is a woman and, at least in part, because he has an animus towards women.   Defendant Muallem's gender-motivated animus toward women is demonstrated by, among other things, his violent treatment of women.

167.   As a direct and proximate result of the aforementioned gender-motivated violence, Plaintiff has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering and serious psychological and emotional distress, entitling her to an award of compensatory damages.

168.   Defendant Muallem's gender-motivated violence against Plaintiff entitles her to punitive damages and an award of attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION
**(Assault)**
***Against Defendant Muallem and Defendant MTA***

169.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

170.   The violent acts committed intentionally by Defendant Muallem against Plaintiff without her consent, including but not limited to, striking Plaintiff, created a reasonable apprehension in Plaintiff of immediate harmful or offensive contact with Plaintiff's person.

171.    Defendant MTA is liable under the doctrine of *respondeat superior* because Defendant Muallem was acting in the scope of his employment with the MTA when he created a reasonable apprehension in Plaintiff of harmful or offensive contact with Plaintiff's person.

172.    As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will continue to sustain, *inter alia*, physical injury, monetary damages, pain and suffering, psychological and emotional distress, humiliation and loss of career fulfillment.

173.    Defendant Muallem's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

<u>**TWELFTH CAUSE OF ACTION**</u>
**(Battery)**
***Against Defendant Muallem and Defendant MTA***

174.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

175.    The violent acts committed intentionally by Defendant Muallem against Plaintiff and without her consent, including but not limited to, striking Plaintiff, constitutes a harmful and offensive contact to Plaintiff's person.

176.    Defendant MTA is liable under the doctrine of *respondeat superior* because Defendant Muallem was acting in the scope of his employment with the MTA when he committed harmful and offensive contact with Plaintiff's person.

177.    As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will sustain in the future, *inter alia*, physical injury, monetary damages, pain and suffering, psychological and emotional distress, mental anguish, embarrassment, humiliation and loss of career fulfillment.

178.   Defendant Muallem's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

### THIRTEENTH CAUSE OF ACTION
**(Negligent Supervision or Retention)**
***Against Defendant MTA***

179.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

180.   Defendant MTA employed Defendants Muallem and Gallo-Kotcher.

181.   Defendant MTA had a mandatory duty of care to properly hire, train, retain, supervise and discipline their employees so as to avoid unreasonable harm to citizens.  With deliberate indifference, Defendant MTA failed to take necessary, proper or adequate measures to prevent the violation of Plaintiff's rights and injury to Plaintiff.  Among other acts and/or failures to act, Defendant MTA retained Defendants Muallem and Gallo-Kotcher and did not terminate their employment despite their knowledge of, and reckless disregard for, Defendants Muallem's and Gallo-Kotcher's propensity for conduct that caused Plaintiff harm.

182.   Defendant MTA breached this duty of care by failing to adequately train employees to not commit, *inter alia*, assault, battery, discrimination or retaliation against its female employees.  This lack of adequate supervisory training and/or policies and procedures demonstrate(s) a failure to make reasonable attempts and to prevent this behavior toward female employees and employees of color.  In addition, the retention of Defendants Muallem and Gallo-Kotcher despite their well-known patterns of tortious conduct was negligent.

183.   Defendant MTA had a duty to control Defendants Muallem and Gallo-Kotcher to ensure their conduct was lawful.

184.     Defendant MTA's negligent supervision and/or retention of Defendants Muallem and Gallo-Kotcher was a substantial factor in causing Plaintiff harm.

185.     Defendants Muallem and Gallo-Kotcher engaged in unlawful conduct on Defendant MTA's property and/or using Defendant MTA's chattels.

186.     Defendant MTA's retention of Defendants Muallem and Gallo-Kotcher and/or the failure to supervise them constitutes gross negligence.

187.     As a direct and proximate result of Defendant MTA's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

188.     Defendant MTA's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

**FOURTEENTH CAUSE OF ACTION**
**(Discrimination in Violation of Title VII)**
***Against MTA***

189.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

190.     Defendant MTA has discriminated against Plaintiff of the basis of her gender in violation of the Title VII by subjecting Plaintiff to disparate treatment based upon her gender, including but not limited to, subjecting her to workplace violence and a hostile work environment.

191.     As a direct and proximate result of Defendant MTA's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

192.    As a direct and proximate result of Defendant MTA's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

193.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

**FIFTEENTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
***Against MTA***

194.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

195.    Defendant MTA has retaliated against Plaintiff on the basis of her protected activity, in violation of Title VII, by subjecting Plaintiff to adverse actions, including exacerbating an already abusive work environment, because she engaged in protected activity.

196.    As a direct and proximate result of Defendant MTA's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

197.    As a direct and proximate result of Defendant MTA's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

198.    Defendant MTA's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the practices complained of herein and any further retaliation and/or tortious conduct;

C.    An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all past and future monetary and/or economic damages;

D.    An award of liquidated damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress and physical illness;

F.      An award of punitive damages against Defendants, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 26, 2021
   New York, New York        Respectfully submitted,

             **WIGDOR LLP**

             By: _____
                Jeanne M. Christensen
                Lindsay M. Goldbrum

             85 Fifth Avenue
             New York, NY 10003
             Telephone:  (212) 257-6800
             Facsimile:  (212) 257-6845
             jchristensen@wigdorlaw.com
             lgoldbrum@wigdorlaw.com

             *Counsel for Plaintiff*